IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KAREN RENE URIAS,

       Plaintiff,

v.                                                                            CIV 16-1063 KBM

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

       Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court on Plaintiff's Motion to Reverse for Payment of Benefits, or in the Alternative, to Remand for Rehearing (*Doc. 15*), filed March 2, 2017. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *Doc. 6*. Having reviewed the parties' submissions, the relevant law, and the relevant portions of the Administrative Record, the Court will grant the Motion.

**I.    Procedural History**

Plaintiff protectively filed an application with the Social Security Administration for disability insurance benefits under Title II of the Social Security Act on June 19, 2012. *AR* at 166.[1] Plaintiff alleged a disability onset date of December 30, 2011, the day she stopped working, due to fibromyalgia and post-traumatic stress disorder ("PTSD"). *AR* at 170. Plaintiff most recently worked as an administrative assistant until she "was let go," because of "a business related decision." *AR* at 32, 170. Plaintiff speculates that

---

[1] Document 10-1 comprises the sealed Administrative Record ("*AR*"). The Court cites the Record's internal pagination, rather than the CM/ECF document number and page.

she was terminated due to her condition "since [she] had been unable to work as scheduled." *AR* at 170. Regardless, Plaintiff testified that she can no longer work "[b]ecause [her] strength doesn't hold out long enough to get through a work day" and because of "brain fog." *AR* at 36, 41, 45.

The agency denied Plaintiff's claims initially and upon reconsideration, and she requested a *de novo* hearing before an administrative law judge. *AR* at 68-107. ALJ Myriam C. Fernandez Rice held an evidentiary hearing on April 30, 2015, at which Plaintiff appeared via video conference. *AR* at 27-64. Plaintiff was represented by attorney Mark Hendricks at the hearing. *AR* at 27. The ALJ issued an unfavorable decision on May 29, 2015. *AR* at 10-22. Plaintiff submitted a Request for Review of the ALJ's Decision to the Appeals Council, which the Council denied on September 7, 2016. *AR* at 1-9. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). This Court now has jurisdiction to review the decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a).

A claimant seeking disability benefits must establish that she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[2]

---

[2] The Tenth Circuit recently summarized these steps in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016):

At Step One of the sequential evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. *AR* at 15. At Step Two, she determined that Plaintiff has the severe impairments of "fibromyalgia; status-post open reduction and internal fixation of tibia and fibula fracture; hypertension; post-traumatic stress disorder ("PTSD"); hypothyroidism; depression; and anxiety[.]" *AR* at 15. At Step Three, the ALJ concluded that Plaintiff's impairments, individually and in combination, do not meet or medically equal the regulatory "listings." *AR* at 15-17.

When a plaintiff does not meet a listed impairment, the ALJ must determine her residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC is a multidimensional description of the work-related abilities a plaintiff retains in spite of her medical impairments. 20 C.F.R. § 404.1545(a)(1). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1. In this case, the ALJ determined that Plaintiff retains the RFC to

> perform light work as defined in 20 CFR 404.1567(b) except she can lift or carry 20 pounds occasionally and 10 pounds frequently; she can stand or walk for approximately 6 hours per 8-hour workday and sit for approximately 6 hours per 8-hour workday, with normal breaks; she can understand, remember, and carry out detailed, but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting; she can have only occasional in person interaction with the public, but telephone contact is not impacted.

---

At step one, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). If not, the ALJ then decides whether the claimant has a medically severe impairment at step two. *Id.* If so, at step three, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the relevant disability regulation.'" *Id.* (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). Absent a match in the listings, the ALJ must decide at step four whether the claimant's impairment prevents him from performing his past relevant work. *Id.* Even if so, the ALJ must determine at step five whether the claimant has the RFC to "perform other work in the national economy." *Id.*

*AR* at 17.

Employing this RFC at Steps Four and Five, and relying on the testimony of a Vocational Expert ("VE"), the ALJ determined that Plaintiff is unable to perform her past relevant work as an administrative assistant, a receptionist and a customer service representative. *AR* at 20. However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform despite her limitations. *AR* at 21. Specifically, the ALJ determined that Plaintiff retains the capacity to work as a credit authorization clerk, an appointment clerk and a claims clerk. *AR* at 21. Accordingly, the ALJ determined that Plaintiff is not disabled and denied benefits. *AR* at 21.

**II.     Legal Standards**

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).

**III.    Analysis**

Plaintiff appeals the ALJ's decision on numerous grounds. *See Doc. 15*. However, because the Court agrees that the ALJ committed legal error when weighing Plaintiff's counselor's opinion, *Doc. 15* at 5, and by failing "to reconcile an inconsistency in the VE testimony with information in the Dictionary of Occupational Titles[,]" *Doc. 15* at 21 (citing *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999)), the Court will reverse and remand on these issues and will not address Plaintiff's other claims of error

4

"because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### A) Weight Assigned to Ms. Coker's Opinions.

Diane Coker, M.A., first saw Plaintiff on March 13, 2013, and she has seen her about once a month since. *AR* at 38, 611. At her initial visit, Plaintiff reported she was unable to work because of her symptoms and described her history of PTSD, possible OCD and depression, and verbal and physical abuse. *AR* at 611. On March 25, 2013, Ms. Coker administered the PTSD, Anxiety Scale and Traumatic Events Assessment. *AR* at 609. Among other things, Ms. Coker noted marked to extreme impairments on Plaintiff's abilities to engage in her activities of daily living, concentrate, maintain friendships, engage in hobbies, and work. *AR* at 608.

In a May 15, 2013 letter, Ms. Coker opined that Plaintiff is unable to work due to the severity of her psychiatric impairments. *AR* at 504. As summarized by the ALJ, Ms. Coker noted that Plaintiff has "panic attacks, recurrent and intrusive recollections of traumatic events, difficulty sleeping, and difficulty concentrating." *AR* at 19, 504. At that time, Ms. Coker diagnosed Plaintiff with PTSD with depression and assessed a GAF[3] score of 40.[4] *AR* at 504.

---

[3] "GAF" stands for "Global Assessment of Functioning." As the Tenth Circuit has noted, "[t]he GAF is a subjective rating on a scale of 1 to 100 of 'the clinician's judgment of the individual's overall level of functioning.'" *Holcomb v. Astrue*, 389 F. App'x 757, 759 n.1 (10th Cir. 2010) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32). The Court notes that the current Diagnostic and Statistical Manual has abandoned the use of GAF scores. Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 16 (5th ed. 2013). Nonetheless, they continue to be used in psychiatric practice, as evidenced by this case.

[4] "A GAF of 31–40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work . . ., family relations, [or] judgment," while a GAF of 41–50 indicates "[s]erious symptoms . . . OR any serious impairment in social or occupational . . . functioning." *Lopez v. Barnhart*, 78 F. App'x 675, 678 (10th Cir. 2003) (quoting

By June 10, 2013, Plaintiff's anxiety had lessened "a little bit." *AR* at 597. However, on August 8, 2013, she was described as "very fearful and anxious." *AR* at 596. By January 31, 2014, Plaintiff had made "a little progress" and was "opening up more about the extent of her impairments – physical, psychological, and emotional." *AR* at 592. On April 11, 2014, Ms. Coker noted that while Plaintiff "is making small steps of progress with multiples issues and challenges," she "has little stamina and gets exhausted quickly." *AR* at 590. On July 16, 2014, Ms. Coker noted that Plaintiff had been able to do a little gardening, as her body felt "a little better" after a vacation at sea level. *AR* at 588.

In a letter dated August 11, 2014, Ms. Coker summarized Plaintiff's symptoms as follows:

> She has extreme anxiety – up to and including panic attacks – over even minor events, especially any discord. She is fearful and tearful, and is unable to stand up for herself. She continues to experience recurrent and intrusive recollections of past traumatic events, distressing dreams, feeling these events are recurring, experiencing extreme psychological distress when exposed to fearfulness. She still cannot remember parts of some of the traumatic events. She has sleep difficulty, and difficulty concentrating, remembering, and making decisions. She has an exaggerated and easily triggered startles response. Ms. Urias feels detached from others and has a restricted range of affect, the most positive being recent occasional feelings of relief. She feels a lot of sadness and cries often. Her anxiety level is high on a daily basis and she isolates herself, avoids social situations, and is afraid to make any changes that might result in disapproval from significant people in her life.

*AR* at 554. Ms. Coker reaffirmed her diagnosis of PTSD with depression and assigned a GAF score of 42. *AR* at 554. On January 15, 2015, Ms. Coker noted that Plaintiff still screams in her sleep and remains anxious about strangers. *AR* at 585. By February 10,

---

American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (Text Revision 4th ed. 2000)).

2015, she noted that Plaintiff was "still very fearful and anxious (and in constant pain) but makes good efforts to cope." *AR* at 584.

On April 22, 2015, Ms. Coker completed a Mental Impairment Questionnaire at the Administration's request. *See AR* at 612. Ms. Coker reaffirmed her diagnosis of Post-Traumatic Stress Disorder with Depression and assessed Plaintiff with a current GAF score of 43. *AR* at 612. When asked to identify Plaintiff's symptoms, Ms. Coker checked boxes for memory impairment, sleep disturbance, persistent disturbances of mood or affect, emotional lability and impulse control, decreased energy, vigilance or scanning, recurrent severe panic attacks, recurrent and intrusive recollections of her traumatic experiences, suspiciousness or hostility, emotional withdrawal/isolation, pressure of speech, easy distractibility, motor tension, apprehensive expectation, persistent irrational fear, recurrent obsessions or compulsions which are a source of marked distress, and marked restricted repertoire of activities and interests. *AR* at 613. Ms. Coker opined that it was "unlikely" Plaintiff could return to work, although some improvement was possible with basic daily functioning and anxiety. *AR* at 614. She further opined that Plaintiff's conditions would cause her to miss work more than three times per month. *AR* at 614. Finally, she indicated that Plaintiff had a marked degree of limitation in the areas of her activities of daily living, social functioning, and in maintaining concentration, persistence, or pace. *AR* at 615.

After reviewing this evidence, the ALJ gave "little weight" to Ms. Coker's opinions, thereby effectively rejecting them, *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight to" an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (citing *Chapo* for this

7

proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (same), for three reasons. *AR* at 19. First, the ALJ noted that Ms. Coker is "not an acceptable medical source under the regulations." *AR* at 19 (citing SSR 06-03p). Next, the ALJ stated that "although the claimant was in therapy sessions with this provider, no mental status examinations were performed." *AR* at 19. Finally, the ALJ found Plaintiff's level of daily activities to be "highly inconsistent with Ms. Coker's imposed limitations." *AR* at 19. Plaintiff contends that all of these reasons are flawed, and that, accordingly, the ALJ failed to weigh Ms. Coker's opinion according to law. *Doc. 15* at 5-10. The Court agrees.

There is a distinction in the regulations between "acceptable medical sources" and those that are not. *See* SSR 06-03p, 2006 WL 2329939 at *2 (Aug. 9, 2006). This distinction is "necessary" because only "acceptable medical sources" can "establish the existence of a medically determinable impairment," give "medical opinions"[5] and be considered "treating sources[6] . . . whose medical opinions may be entitled to controlling weight." *Id.* (citations omitted). "Acceptable medical sources" include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. *Id.* Every other healthcare provider is referred to as an "other source." *Id.*

While information from "other sources" "cannot establish the existence of a medically determinable impairment . . . information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity

---

[5] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

[6] "Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2).

of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2; *see also Carpenter v. Astrue*, 537 F.3d 1264, 1267-68 (10th Cir. 2008) (explaining that while "other sources" cannot *diagnose* an impairment, their opinions are relevant to "the questions of *severity* and *functionality*") (citing *Frantz v. Astrue*, 509 F.3d 1299, 1301-02 (10th Cir. 2007)). As such, opinions from "other" "medical sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. "Other medical evidence[,]" which "is evidence from a medical source that is not objective medical evidence or a medical opinion" as defined by the regulations, includes a claimant's medical history, clinical findings, and "treatment prescribed with response." 20 C.F.R. § 404.1513(a)(3).

Medical evidence and opinions from an "other source" are weighed under the factors stated in 20 C.F.R. §§ 404.1527(c)(1) through (c)(6). 20 C.F.R. § 404.1527(f)(1). These factors include: (1) the examining relationship; (2) the treatment relationship; (3) supportability of the opinion; (4) consistency of the medical opinion with the record as a whole; (5) specialization; and, (6) any "other factors" "which tend to support or contradict the medical opinion." 20 C.F.R. §§ 404.1527(c)(1)-(6); *see also Crowder*, 561 F. App'x at 744-45. That said, "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source . . . depends on the particular facts in each case." 20 C.F.R. § 404.1527(f)(1). Indeed, depending on the facts of the case, an opinion from a medical source that is not "acceptable" under the regulations may outweigh one that is. 20 C.F.R. § 404.1527(f)(1); SSR 06-03p, 2006 WL 2329939 at *5. "The adjudicator

9

generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2); SSR 06-03p, 2006 WL 2329939 at *6.[7]

The Commissioner, relying on this last statement, asserts that the ALJ in this case "provided multiple good reasons, sufficient for this Court to follow, why he (sic) did not provide more weight to Ms. Coker's opinion[s]." *Doc. 17* at 8 (citing *Keyes-Zachary*, 695 F. 3d at 1163; SSR 06-03p, 2006 WL 2329939 at *6). However, when the ALJ's reasons for discounting Ms. Coker's opinions are examined closely, it is apparent that she committed legal error.

First, the Commissioner argues that the ALJ "properly noted that Ms. Coker is not an acceptable medical source[.]" *Doc. 17* at 8. As described above, the distinction between acceptable medical sources and those that are not is "necessary" for three reasons. However, none of those reasons are applicable to Ms. Coker's conclusions. While an "other source" may not establish the existence of a medically determinable impairment, their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939 at *3. Thus, as Plaintiff correctly argues, Ms.

---

[7] The failure of an ALJ to properly weigh an "other source's" opinion is harmless where the opinion fails to offer an assessment of the effect of the claimant's mental limitations on her ability to work. *See Keyes-Zachary*, 695 F. 3d at 1164. Additionally, if an "acceptable medical source's" opinion contradicts that of an "other source" the same may "alone justif[y] reliance" on the "acceptable medical source" over the "other source." *Id.*; *see Lundgren v. Colvin*, 512 F. App'x 875, 880 (10th Cir. 2013) (citing *Keyes-Zachary* for this proposition). Unfortunately for the Commissioner, neither situation is applicable here.

10

Coker's status as an "acceptable medical source" is not a legally sound reason to reject her findings as to the severity of Plaintiff's impairments and their effect on her ability to work.[8]

As to the ALJ's second reason, that "no mental status examinations were performed," *AR* at 19, Plaintiff argues that "there is no requirement in the regulation[s] that a mental health counselor perform such an examination[.]" *Doc. 15* at 9. The Commissioner posits, however, that the ALJ properly noted the absence of formal mental status examinations pursuant to 20 C.F.R. § 404.1527(c)(3), which requires adjudicators to consider the "supportability" of the opinion. *See Doc. 17* at 8. Under this provision,

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions. We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources.

20 C.F.R. § 404.1527(c)(3). The Commissioner thus contends that because Ms. Coker's records were devoid of "any objective clinical observations," the ALJ rightly discounted her opinions. *See Doc. 17* at 8-9.

The difficulty with the Commissioner's argument is that it too fails to point to any promulgation, policy statement, or even psychiatric literature, whether in the regulations,

---

[8] Support for this notion is found in the Agency's current regulations, which completely discard the distinction between acceptable medical sources and those that are not for claims that are filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1513; 404.1520c; 404.1527. While these regulations do not affect the Court's analysis in this case, they are instructive.

11

case law or otherwise, that a mental health provider's opinions are dismissible on the basis that she fails to conduct a formal mental status examination. To the contrary, the Tenth Circuit has reversed an ALJ who rejected a treating psychologist's opinion on the grounds that he did not perform a "thorough mental status exam." *See Schwarz v. Barnhart*, 70 F. App'x 512, 517-18 (10th Cir. 2003). As the Court recognized in *Schwartz*, "there is no 'dipstick' test for disabling depression." *Id.* at 518. Thus, the Court rejected the notion that a psychologist's opinion could be discounted "for lack of clinical findings based on psychological tests." *Id.* The Court has reviewed the current and previous versions of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") and neither appears to require a mental status examination to make a diagnosis. Moreover, as Plaintiff points out, many of Ms. Coker's findings in her medical records mirror the type of information normally obtained from a mental status examination. *See* POMS DI 34132.011, <htttps://secure.ssa.gov/apps10/poms.nsf/lnx/0434132011>.[9] Accordingly, while the ALJ may have permissibly noted the lack of formal mental status examinations in Ms. Coker's records, the absence of the same was not a sufficient reason to completely reject her findings, as the ALJ did here.

---

[9] As explained by the Administration:

> The mental status examination is performed in the course of a clinical interview and is often partly assessed while the history is being obtained. A comprehensive mental status examination generally includes a narrative description of your appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight. The individual case facts determine the specific areas of mental status that need to be emphasized during the examination.

*Id.*

This leaves the ALJ's last reason – that "the claimant's reported level of daily activity is highly inconsistent with Ms. Coker's imposed limitations." *AR* at 19. In support of this rationale, the ALJ relied on Plaintiff's Function Report (Exhibit 7E, *AR* at 215-23), and summarized that report as follows:

> the claimant reported she could take care of her personal needs, prepare small meals, do light household chores, drive, shop in stores, and pay bills. She also denied difficulty getting along with family, friends, neighbors or others. Moreover, she reported she had never been fired or laid off from a job because of difficulty getting along with others. Furthermore, the claimant reported she read daily. She also reported she spent her time writing, carving wood, painting, sewing, crocheting, and watching television. Therefore, I find she is capable of performing detailed, non-complex job tasks with only occasional public interaction (telephone contact not precluded). The medical evidence, when considered in the light most favorable to the claimant, does not warrant further limitations.

*AR* at 19. The Commissioner argues that this factor was rightly considered by the ALJ under 20 C.F.R. § 404.1527(c)(4), because "[t]hese activities, while described as being occasionally limited, stood in stark contrast to the extreme functional limitations opined by Ms. Coker." *Doc. 17* at 9.

The Court recognizes that pursuant to 20 C.F.R. § 404.1527(c)(4), "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight [an ALJ] will give to that opinion." *Id.* However, the ALJ, and the Commissioner, have failed to show how Plaintiff's Function Report is inconsistent with the limitations Ms. Coker observed. For, while Plaintiff averred that she could perform the functions stated above, her statements were unquestionably qualified. *See generally AR* at 215-23.

For example, while Plaintiff can "usually" dress on her own, she needs help on bad days. *AR* at 217. She also reported that she "sometimes" needs help getting in and out of the tub and that when her fatigue is "really bad" she needs help getting to and

13

from the toilet. *AR* at 217. In terms of meal preparation, Plaintiff stated that she only "sometimes" prepares her own meals. *AR* at 218. While the ALJ stated that Plaintiff can perform "light household chores," *AR* at 19, what she actually indicated was that she can do "dishes, some laundry, a little sweeping, water some of our trees and plants, sit in the garden do a little weeding" for, at most, 15 minutes at a time. *AR* at 218. In terms of driving, Plaintiff stated that she can drive, but does not do so when she is "fatigued or foggy," *AR* at 219, and she testified: "which means a lot of days I don't drive." *AR* at 38. In fact, Plaintiff testified that sometimes a couple of weeks goes by that she doesn't drive. *AR* at 38. While she is able to shop in stores, Plaintiff only does so weekly, if she is able. *AR* at 219. While Plaintiff admits she can pay bills, she only does so early in the morning when she is fresh, *AR* at 36, and she has to be "really careful" because she "make[s] mistakes a lot." *AR* at 219. As for Plaintiff's ability to associate and get along with others, Plaintiff admits that she associates with family and friends, but she also testified that strangers cause her to panic, *AR* at 45-46, and averred that she "tend[s] to avoid authority figures, especially if they are older men." *AR* at 222. As for her hobbies, true, Plaintiff reads almost daily; but she "sometimes [] read[s] things over and over because [she's] not retaining it." *AR* at 220. Plaintiff also writes, but only a few times a month. *AR* at 220. And she does carve wood and paint, but only a few times a year. *AR* at 220. As for sewing, she doesn't do it much, because it's "too much trouble." *AR* at 220.

In sum, Plaintiff does not lead the robust life chronicled by the ALJ, but, rather, one that is restricted to various degrees depending on the severity of her fibromyalgia symptoms. *Cf. Krauser v. Astrue*, 638 F.3d 1324, 1332 (10th Cir. 2011) ("the specific

14

facts behind the generalities paint a very different picture"). In fact, in the Function Report that supposedly contradicts Ms. Coker's findings of disabling symptoms, Plaintiff indicated that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, follow instructions, and use her hands. *AR* at 221. It is difficult to reconcile the contents of this function report with the ALJ's description of Plaintiff's daily activities. As such, the Court finds this reason to be unsupported by substantial evidence.

As the Commissioner recognized when promulgating SSR 06-03p: "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources' . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 232939 at *3. It makes littles sense that the Commissioner would simultaneously recognize this fact while permitting her ALJs to discount the evidence produced from such sources on the grounds employed by the ALJ here. Therefore, having determined that the ALJ's reasons for discounting Ms. Coker's opinions are legally unsound, the Court will reverse and remand this case for further analysis of Ms. Coker's opinions by the ALJ.

**B) Job-Specific Errors and Apparent Conflict in Need of Resolution.**

In *Haddock*, the Tenth Circuit held "that the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary [of Occupational Titles] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Haddock*, 196 F.3d at 1091. Closely following that decision, the Commissioner issued SSR 00-4p, which discusses

the "Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). Pursuant to SSR 00-4p: "[w]hen there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." *Id.* at *2.

"At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." SSR 00-4p, 2000 WL 1898704 at *2. This is an "affirmative responsibility" in which the adjudicator must both "[a]sk the VE or VS if the evidence he or she has provided conflicts with the information provided in the DOT; and [i]f the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." *Id.* at *4.

These principles were extended to GED[10] reasoning levels in *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). There, the plaintiff argued that her RFC, as found by the ALJ, was inconsistent with jobs requiring level 3 reasoning. *Id.* The Tenth Circuit agreed, holding that an apparent conflict existed between the plaintiff's mental RFC, which found that she "retain[ed] the attention, concentration, persistence and pace levels required for simple and routine work tasks" and jobs requiring level 3 reasoning. *Id.* In so finding, the court noted that level 2 reasoning

---

[10] "GED" stands for "General Educational Development" which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." DOT App. C, § III, 191 WL 688702. "The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." *Id.* Pertinent to this case, there are 6 levels of Reasoning Development, with 1 representing the lowest level and 6 representing the highest. *Id.*

16

appeared more consistent with the plaintiff's RFC. *Id.* The Court also reversed and remanded despite the fact that the plaintiff was represented by counsel before the ALJ. *Id.*

Initially, the Court notes that the ALJ failed to comply with SSR 00-4p by failing to ascertain, on the record, whether the VE's testimony was consistent with the DOT. *See AR* at 57-64. The ALJ initially asked the VE if she knew that her testimony "must be consistent with the Dictionary of Occupational Titles." *AR* at 58. However, after eliciting testimony about the jobs Plaintiff purportedly can perform, the ALJ never verified that the VE's testimony was in fact consistent with the DOT. *See AR* at 57-64. This is error. *See Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009) ("the ALJ erred by not inquiring about whether there were any conflicts between the VE's testimony about the job requirements for the jobs identified and the job descriptions in the DOT"). The question is whether the error was harmful. *Id.* ("finding that "[b]ecause there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless."). The Court concludes that the ALJ's error was harmful because there was an apparent conflict between the jobs identified in this case and Plaintiff's RFC.

As Plaintiff contends, the reasoning levels associated with the jobs identified by the VE exceed her RFC. All three jobs identified by the VE require GED reasoning levels of 3 or 4. *See* DOT 249.367-022, 1991 WL 672327 (credit authorization clerk – reasoning level 3); DOT 237.367-010, 1991 WL 672185 (appointment clerk – reasoning level 3); DOT 241.362-010, 1991 WL 672250 (claims clerk – reasoning level 4). Reasoning level 4 requires that a worker be able to "[a]pply principles of rational

systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form." *Id.* And reasoning level 3 requires that a worker be able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id.* By contrast, reasoning level 2 requires workers to "[a]pply common sense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving few concrete variables in or from standardized situations." *Id.*

As determined by the ALJ, Plaintiff retains the RFC to "understand, remember, and carry out detailed but not complex instructions. . . ." *AR* at 17. Plaintiff's RFC, therefore, more closely matches the requirements of level 2 reasoning than levels 3 and 4. As such, the Court finds that there is an apparent conflict between Plaintiff's RFC and the reasoning levels of the three jobs identified by the VE.

Of course, "[n]either the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict." SSR 00-4p, 2000 WL 1898704 at *2. However, "[t]he adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." SSR 00-4p, 2000 WL 1898704 at *2. Here, the ALJ failed to even recognize that a conflict existed, and, consequently, she failed to ask the VE to explain the conflict. Absent an explanation, the ALJ could not rely on the VE testimony as substantial evidence supporting her decision. Accordingly, the Court "must reverse this portion of the ALJ's decision and remand to allow the ALJ to address the apparent

conflict" between Plaintiff's RFC and the level three and four reasoning required by the jobs identified as appropriate for her by the VE. *Hackett*, 395 F.3d at 1176.

The Commissioner "acknowledges" that *Hackett* is controlling, but argues that it is distinguishable from the present case because Plaintiff here is able to "understand, remember, and carry out detailed but not complex instructions," whereas the plaintiff in *Hackett* was limited to "simple and routine" work tasks. *Doc. 17* at 15. However, as recognized above, Plaintiff's RFC is arguably more consistent with level 2 reasoning than was the plaintiff's in *Hackett*. *See Paulek v. Colvin*, 662 F. App'x 588, 594 (10th Cir. 2016) (recognizing that "the Eighth Circuit has held that a limitation to simple instructions is inconsistent with **both** level-two and level-three reasoning." (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (emphasis added)).

The Commissioner also protests that "[i]n other unpublished decisions, the Tenth Circuit has recognized that GED levels describe general educational background, not specific mental or skill requirements." *Doc. 17* at 15 (citing *Anderson v. Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013); *Mounts v. Astrue*, 479 F. App'x 860, 868 (10th Cir. 2012)). While the Tenth Circuit has indeed recognized that "GED does not describe specific mental or skill requirements of a particular job, but rather describes the general educational background that makes an individual suitable for the job," *Anderson*, 514 F. App'x at 764, both *Anderson* and *Mounts* are distinguishable from this case, and neither contradicts *Hackett*. *See Parrish v. Berryhill*, CIV 16-0453 LAM, 2017 WL 2491526 (D.N.M. April 12, 2017) (analyzing both cases and concluding that neither "actually conflicts with *Hackett*"). In *Anderson* the VE identified two other jobs that fit within the plaintiff's RFC. *Anderson*, 514 F. App'x at 764. Accordingly, the ALJ's error in failing to

recognize the conflict with another job was harmless. *Id.* Likewise, in *Mounts*, "[t]here [was] no genuine dispute that Mounts retained the GED to perform the jobs" identified by the VE. *Mounts*, 479 F. App'x at 868. In sum, "Defendant makes a number of valid points apparently not considered in *Hackett*. Ultimately, however, these points amount to an argument that *Hackett* was wrongly decided and do nothing to address whether *Hackett* is controlling." *Castillo v. Colvin*, No. 14-978 SCY, 2016 WL 4425729, at *6 (D.N.M. Jan. 5, 2016).

## IV. Conclusion

The Court finds that Plaintiff's motion to remand is well-taken and that this matter should be remanded for reevaluation of the weight to be afforded to the opinion of her treating counselor, Ms. Coker, and of the jobs that are available to her given her RFC, as set forth above.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse for Payment of Benefits, or in the Alternative, to Remand for Rehearing (*Doc. 15*) is **granted**.

**IT IS FURTHER ORDERED** that a Final Order pursuant to Rule 58 of the Federal Rules of Civil Procedure be entered remanding this matter back to the Acting Commissioner for further proceedings consistent with this opinion.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent